United States District Court
Southern District of Texas

**ENTERED**

April 01, 2016

David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| AMY LEE FENNER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:14-cv-02130 |
| | § | |
| CAROLYN W. COLVIN, Acting | § | |
| Commissioner of Social Security | § | |
| Administration, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

Plaintiff Amy Lee Fenner ["Fenner"] brings this action pursuant to the Social Security

Act, 42 U.S.C. 405(g), seeking judicial review of a final decision by Defendant Carolyn W.

Colvin, Acting Commissioner of the Social Security Administration ["Commissioner"], denying

her application for disability insurance benefits.  (Complaint, Docket Entry No. 1).  The parties

have consented to proceed before a United States magistrate judge for all purposes, including the

entry of a final judgment, under 28 U.S.C. § 636(c).  (Docket Entry No. 5).  Before the court are

the parties' cross-motions for summary judgment and supporting memoranda.  (Plaintiff's

Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry No. 7; Defendant's Cross-

Motion for Summary Judgment ["Defendant's Motion"], Docket Entry No. 8; Memorandum in

Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Memorandum"],

Docket Entry No. 9).  Each party has also filed a response to the competing motions.  (Plaintiff's

Response to Defendant's Cross-Motion for Summary Judgment ["Plaintiff's Response"], Docket

Entry No. 10; Defendant's Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry No. 11).

After considering the pleadings, the evidence submitted, and the applicable law, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

## I. Background

On July 19, 2011, Fenner filed an application for disability insurance benefits ["DIB"], under Title II of the Social Security Act ["the Act"]. (Transcript, Docket Entry No. 4, at 121-27). In her application, Fenner claimed that she had been unable to work since June 1, 2011, due to a "cervical degenerative disc disease," "depression," "radiculopathy," "spondylosis," "neuralgia," "stenosis," "myeloradiculopathy," "osteoarthritis," "depression," and "many other conditions." (Tr. 140, 144). The Commissioner denied Plaintiff's application on November 1, 2011, and, again, upon reconsideration, on January 27, 2012. (Tr. 70-73, 80-82). Plaintiff then successfully requested a hearing before an administrative law judge ["ALJ"]. (Tr. 83-84). That hearing took place on February 25, 2013, before ALJ Helen Strong. (Tr. 29-66). Plaintiff appeared and testified at the hearing, accompanied by her attorney, Weston Cotton. (Tr. 29, 34-36, 45-48). The ALJ also heard testimony from a vocational expert, Byron J. Pettingill, and a medical expert, Dr. John C. Anigbogu. (Tr. 18, 29, 36-45, 58-66, 112-13).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Fenner was disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Fenner has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

An individual claiming DIB under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209

3

F.3d at 452.  A "physical or mental impairment" is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  The impairment must be so severe as to limit the claimant so that she "is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  It must be stressed that the mere presence of an impairment is not enough to establish a disability under the Act.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  Rather, a claimant is disabled only if she is "incapable of engaging in substantial gainful employment." *Id.*

Based on these principles, as well as her review of the evidence presented at the hearing, the ALJ determined that Plaintiff "did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2011 through her date last insured of December 31, 2012[.]"  (Tr. 20).  The ALJ further concluded that Fenner suffered from "discogenic and degenerative disorders of the cervical and lumbar spine with residual effects of cervical spine surgery," as well as "hyptertension."  (*Id.*).  Although she determined that these impairments, alone or in combination, were severe, she concluded, ultimately, that Plaintiff's impairments did not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[1]  (Tr. 20-21).  The ALJ also found that Plaintiff's alleged mental impairment of depression was "not medically determinable."  (Tr. 21).  Drawing from the evidence, the ALJ concluded that Fenner had the residual functional capacity ["RFC"] to perform a full range of

---

1.  A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations.  *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

sedentary work.  (*Id.*).  Ultimately, the ALJ determined that Fenner's physical and mental impairments do not preclude her from returning to her past relevant work as an "appointment clerk."  (Tr. 23).  For that reason, the ALJ concluded that Fenner was not disabled, within the meaning of the Act, and she denied her applications for benefits.  (Tr. 24).

On May 2, 2013, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. 7).  SSA regulations provide that the Appeals Council will grant a request for a review if: (1) "there is an apparent abuse of discretion by the ALJ;" (2) "an error of law has been made;" (3) "the ALJ's action, findings, or conclusions are not supported by substantial evidence;" or (4) "there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On May 22, 2014, the Appeals Council denied Fenner's request, finding that no applicable reason for review existed.  (Tr. 1-6).  With that ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On July 25, 2014, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry No. 1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court concludes that Defendant's motion should be granted, and that Plaintiff's motion should be denied.

## II. Standard of Review

In social security disability cases, the court's review is limited to determining: "(1) whether substantial evidence supports the Commissioner's decision[;] and (2) whether the Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (citing *Brock v. Chater*, 84 F.3d 726, 727 (5th Cir. 1996)).  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a

conclusion. *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla and less than a preponderance." *Copeland*, 771 F.3d at 923; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). "In determining whether substantial evidence of disability exists, th[e] court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Perez*, 415 F.3d at 462.

In applying the "substantial evidence" standard on review, the court must scrutinize the record to determine whether such evidence is present. *Id.* at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). But the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute [its] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner]'s decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Copeland*, 771 F.3d at 923; *see Perez*, 415 F.3d at 461 ("Conflicts of evidence are for the Commissioner, not the courts, to resolve."). "If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed." *Perez*, 415 F.3d at 461 (citing *Richardson*, 402 U.S. at 390). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

## III. Discussion

Plaintiff challenges the ALJ's findings on two grounds. First, Fenner argues that the ALJ erred at step two of her analysis, because she did not find her mental impairments to be "severe."

(Pl.'s Mot. 4, 8-11).  Next, Fenner challenges the RFC determination made by the ALJ, claiming that it does not take into account all of her limitations.  (*Id.* at 4-8).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Def.'s Mem. 3-5).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that, on July 12, 2005, Fenner was seen by a neurosurgeon, Dr. Randhir Sinha.  (Tr. 463-66).  Fenner complained of radiating lower back pain on the left side of her body.  (Tr. 463).  She reported that the pain had progressively worsened over the past year.  (*Id.*).  Upon examination, Dr. Sinha observed "numbness in [the] L5 dermatome," and he noted that Fenner had "some difficulty getting up from a squatting position."  (*Id.*).  However, Plaintiff's cortical functions, cranial nerves, bilateral straight leg raising ability, and knee and ankle jerks were all normal.  (*Id.*).  An MRI of Plaintiff's lumbar spine revealed "mild degenerative facet joint changes at L3-4 through L5-S1," and "[d]iffuse chronic spondylosis with slight disc space narrowing at L5-S1."  (Tr. 461).  Dr. Sinha diagnosed Fenner as suffering from "mild" L5 radiculopathy.  (Tr. 464).

Six months later, on December 6, 2006, Fenner sought treatment from a family practitioner, Dr. Angelis Berios.[2]  (Tr. 392).  Fenner reported a history of muscle loss, hypertension, migraines, thyroid problems, and toxemia.  (*Id.*).  Dr. Berios observed that Plaintiff was "obese," and that she suffered from "occasional" lower back pain.  (*Id.*).  Her weight on that date was reported to be 194 pounds, and her blood pressure was 130/80.  (*Id.*).  Blood tests revealed elevated levels of LDL cholesterol, triglycerides, and triiodothyronine.  (Tr. 442-44).  Dr. Berios diagnosed Fenner as suffering from hypothyroidism, hyperlipidemia, and

---

2.  Dr. Berios's treatment notes are handwritten, and many of them are difficult to read, if not illegible.

hypertension.  (Tr. 392).  She was prescribed an estrogen hormone, Levothyroxine, Maxzide, and Fioricet.  (*Id.*).

On December 15, 2006, Fenner returned to Dr. Berios, complaining of headaches, "fluttering" eyes, and "vertigo."  (Tr. 415).  She denied any recent incidents of chest pain or shortness of breath.  (*Id.*).  A Carotid Intima-Media Thickness Test revealed some thickening of her arteries, but no evidence of plaque.  (Tr. 451).  Plaintiff was prescribed Fenofibrate, Rosuvastatin, and Levothyroxine.  (Tr. 415).

Fenner went back to Dr. Berios for follow-up appointments on January 10, 2007, and on January 22, 2007.  (Tr. 414).  Treatment notes from the January 10, 2007 visit reveal no complaints of pain, and an unremarkable physical examination.  Plaintiff was prescribed Ambien, in addition to her other medications.  (*Id.*).  At the appointment on January 22, 2007, however, Fenner reported chronic neck and back pain, reportedly as a result of a 2001 motor vehicle accident.  (Tr. 413).  Dr. Berios referred Plaintiff to a pain management specialist, Dr. Jeff M. Arthur, at the Pain Diagnostics and Therapeutics Center.  (*Id.*).

One month later, on February 22, 2007, Plaintiff saw Dr. Arthur for an initial consultation.  (Tr. 585-86).  Fenner complained of a "pins and needles" pain in the left trapezius, right trapezius, and lower posterior portions of her neck, as well as an "aching" pain in the bilateral lumbosacral region of her back, and in her lower extremities.  (Tr. 585).  Plaintiff reported that her neck pain had begun six months earlier, and that it worsened with upper extremity use and sitting.  (*Id.*).  She stated that her back pain had begun five years earlier, and that it worsened with driving and sitting.  (*Id.*).  She claimed that "nothing" made the pain better. (*Id.*).  Upon examination, Dr. Arthur observed "[u]pper paraspinal neck pain," "[b]ilateral occiput tenderness," "upper facet tenderness," and "[l]eft [sacroiliac joint] tender[ness]."  (Tr.

586).  Plaintiff's gait, bilateral straight leg raising ability, and hip flexion, extension, and rotation were unremarkable.  (*Id.*).  A cervical spine MRI revealed "[m]ultilevel degenerative changes of the intervertebral discs and uncovertebral joints," as well as a "[c]ompressive effect on the ventral surface of the [spinal] cord [] at C3-C4 on the left, C4-C5 on the left[,] and C5-C6 on the right[.]"  (Tr. 580).  An MRI of Plaintiff's lumbar spine showed "[d]isc protrusions at L1-2 and L5-S1, not resulting in significant stenosis of the canal or impingement upon the nerve roots," and "[f]acet hypertrophy at L4-5 and L5-S1."  (Tr. 582).  Dr. Arthur diagnosed Fenner as suffering from cervical facet arthropathy, occipital neuralgia, and sacroiliac joint arthropathy.  (Tr. 586).  She was prescribed Flexeril.  (*Id.*).

On May 2, 2007, Plaintiff returned to Dr. Berios for a refill of her medications.  (Tr. 412).  On that date, her weight was 179 pounds, and her blood pressure was 118/70.  (*Id.*).  Blood tests showed an elevated glomerular filtration rate, an elevated platelet count, and elevated levels of remnant lipoprotein, calcium, and thyroxine.  (Tr. 439-41).  Plaintiff was said to be suffering from chronic neck and back pain, radiculopathy, hypothyroidism, and hyperlipidemia.  (Tr. 412).

The next day, Fenner was seen by an orthopedic surgeon, Dr. David W. Wimberley, for an initial evaluation.  (Tr. 491-93).  She reported an "aching and stabbing" pain in her neck, which had begun ten years earlier, as well as a "burning and shooting" pain in her left arm, which had begun "more recently."  (Tr. 491).  She rated her pain level as "7/10."  (*Id.*).  Plaintiff also reported "weakness" in her left arm, and "clums[iness]" with the use of her left hand.  (*Id.*).  Dr. Wimberley examined Fenner and recorded his observations as follows:

> The cervical spine shows a normal coronal and sagittal alignment.  There are no masses palpable anteriorly or posteriorly.  There is no pain with palpation of the posterior spinous processes or ligamentous complex.  She has mild pain with palpation of her lower cervical paraspinous musculature and trapezial muscle bellies bilaterally.  She has a limited range of motion of her cervical spine with flexion down to within 2 finger-breadths of her chest, extension to 20 degrees,

lateral flexion to 30 degrees, and rotation of 40 degrees to the left and right. There is a negative Lhermitte's sign. She has a markedly positive Spurling sign on the left and negative on the right hand side. The upper extremities have subjectively intact sensation to light touch in the C5 through T1 dermatomes. She has a half-grade of weakness of her left hand intrinsics. Otherwise, she appears to have 5/5 strength at all myotomes in both upper extremities. Deep tendon reflexes are 2+ and symmetric at the biceps, brachioradialis[,] and triceps modalities. There is a negative Hoffmann's sign. Upper extremities are well perfused with palpable pulses at the radial artery and brisk capillary refill into the hands. The shoulder shows no sign of impingement by Neer or Hawkins sign. Rotator cuff strength is intact.

(Tr. 492-93). Dr. Wimberley ordered a cervical spine myelogram, which revealed "[s]mall to moderate sized ventral extradural defects [] at the C3-4, C4-5[,] and C5-6 levels," as well as "underfilling of the left C6 nerve root." (Tr. 322). The results from a CT scan of Plaintiff's cervical spine showed "mild disc degeneration[,] [m]ild spondylosis[,] . . . [m]ild central canal stenosis[,] [and] [m]ild right foraminal stenosis" at the C3-4 level; "moderate disc degeneration with spondylosis and mild disc bulging" at the C4-5 level; "moderate disc degeneration with spondylosis[,] [m]ild central canal stenosis[,] . . . moderate foraminal [stenosis][,] and mild right foraminal stenosis" at the C5-6 level; and "mild [] degeneration" at the C6-7 level." Dr. Wimberley concluded that Fenner suffered from "cervical disc displacement [at the] C3-4, C4-5, [and] C5-6 [levels] with likely early [cervical] myeloradiculopathy." (Tr. 491). He noted that Fenner "might be a candidate" for anterior cervical decompression and fusion ["ACDF"] surgery. (Tr. 493). Plaintiff was prescribed Methylprednisolone, and advised to make a follow-up appointment. (*Id.*).

On May 22, 2007, Fenner again saw Dr. Wimberley to review the results of her cervical spine myelogram, and to discuss her "surgical and non-surgical treatment options." (Tr. 489-90). During that visit, Fenner elected to proceed with surgery. (Tr. 490).

Three weeks later, on June 13, 2007, Plaintiff underwent a C3-4, C4-5, and C5-6 ACDF

procedure at the Texas Orthopedic Hospital in Houston, Texas.  (Tr. 511).  Her pre-operative diagnosis was "[c]ervical disc displacement with stenosis and radiculopathy, C3-4, C4-5, and C5-6."  (*Id.*).  Hospital records reveal that the ACDF procedure was performed "without difficulties," and that, following the surgery, Fenner was "in very good shape."  (Tr. 518).  Her radiculopathy was found to be "completely resolved."  (*Id.*).  Plaintiff was discharged from the hospital the next day.  (*Id.*).

On June 21, 2007, Fenner returned to Dr. Wimberley for a post-operative evaluation. (Tr. 488).  Fenner reported that she was "doing exceedingly well," and that she was "thrilled with her surgical results so far."  (*Id.*).  She reported no arm pain, and only "minimal" neck pain. (*Id.*).  Dr. Wimberley wrote that Fenner "did have an episode of what sounds like a cervicothoracic muscular spasm that occurred when she was bending forward," but noted that the condition "ha[d] subsequently gotten better."  (*Id.*).  Post-operative imaging of Fenner's cervical spine showed a "well-positioned C3 to C6 ACF."  (*Id.*).  Dr. Wimberley instructed Plaintiff to wear a cervical brace for six weeks, and to follow-up with him in three months.  (*Id.*).

Fenner went back to Dr. Wimberley approximately one month later, on July 19, 2007. (Tr. 486-87).  She complained of a "sensation of a mass at the posterior aspect of her neck," but admitted that she was "feeling very well," and denied any other symptoms.  (Tr. 486).  Upon examination, Dr. Wimberley observed a "slight prominence near her cervicothoracic junction posteriorly in the region of the C7 spinous process," but found no evidence of a "discrete mass palpable."  (*Id.*).  He concluded that Plaintiff's symptom was likely "related to some postoperative swelling or brace irritation," and that it was otherwise not "of any consequence." (*Id.*).  Plaintiff was advised to continue with her current treatment regimen.  (Tr. 487).

On August 16, 2007, Plaintiff returned to Dr. Berios for a medication refill.  (Tr. 411).

She complained of abdominal pain, diarrhea, and constipation. (*Id.*). She also stated that her Ambien medication was "too strong." (*Id.*). Dr. Berios prescribed Synthroid, Maxide, Prevarin,Tricor, Crestor, Omacor, Ambien, and Fioricet. (*Id.*).

On September 6, 2007, Plaintiff was again seen by Dr. Wimberley. (Tr. 484-85). She complained of worsening neck pain, occipital headaches, a "clicking" sound in her neck, and some difficulty getting out of her brace. (Tr. 484). Plaintiff reported no symptoms with her arms. (*Id.*). Dr. Wimberley instructed Fenner to wean herself off of the brace more slowly, and to use a heating pad and anti-inflammatory medication for her "ongoing apparent muscular discomfort." (Tr. 485).

On October 4, 2007, Fenner returned to Dr. Wimberley, complaining of pain and discomfort in her lower back and left leg. (Tr. 482-83). Plaintiff reported that her neck was "doing well." (Tr. 482). Dr. Wimberley examined Fenner, and observed "mild pain with palpation of her lower lumbar paraspinous musculature," "pain with palpation of her left sciatic notch," and "subjectively decreased sensation on the left in the L5 and S1 dermatomes." (Tr. 482-83). However, Plaintiff exhibited a full range of motion in her thoracolumbar spine and hips, a normal gait, and 5/5 strength levels in her lower extremities. (*Id.*). Plaintiff was able to toe walk, to heel walk, and to squat and rise without the use of her hands. (Tr. 482). Dr. Wimberley noted further that Fenner's bilateral straight leg raising ability was normal, and that she had no sensory or reflex deficits. (Tr. 483). He advised Plaintiff to undergo selective nerve root block injections at the at the left L5 and S1 nerves. (*Id.*).

Later that day, Fenner attended a physical therapy session. (Tr. 558-59). She reported that her neck "continue[d] to feel better." (Tr. 558). Treatment notes from that session reveal that Fenner was "progress[ing] well with therapy," and that she experienced only "mild

limitations" with respect to the range of motion and strength of her cervical spine.  (*Id.*).  It was noted that Fenner "seem[ed] to be more concerned with low back issues."  (*Id.*).

On October 10, 2007, Fenner went to the North Houston Pain Center ["NHPC"] to begin selective nerve root block ["SNRB"] injection treatment.  (Tr. 362-63).  Fenner reported a "long history" of progressively worsening lower back pain, which radiated down to her left knee.  (Tr. 362).  Plaintiff also reported a "tingling" sensation in her left foot, which increased with prolonged sitting, repetitive bending, or lifting.  (*Id.*).  She stated that heating pads and over-the-counter pain medications "seem[ed] to help" her symptoms.  (*Id.*).  The treating physician, Dr. Chandler Mann, noted that Plaintiff had recently undergone a "very successful" ACDF procedure, and that she had "absolutely no cervical symptoms."  (*Id.*).  Dr. Mann observed that Fenner had a normal gait, an "essentially [] negative straight leg raise," a normal spine alignment, no sensory or reflex deficits, and no spinous process tenderness.  (Tr. 363).  Plaintiff was able to twist and bend to her distal tibia without difficulty, but extension "seem[ed] to bother her."  (*Id.*).  Dr. Mann advised Plaintiff that, due to her recent ingestion of Aspirin, she must wait eight more days to begin the injections.  (*Id.*).

Two weeks later, on October 24, 2007, Plaintiff returned to the NHPC for the SNRB injections at the left L5 and left S1 nerves.  (Tr. 506-08).  The injections produced "[n]egative pain provocation at L5 and positive concordant pain provocation at S1."  (Tr. 506).  Plaintiff rated her post-injection pain level as "2/10," down from "6/10."  (*Id.*).

On November 7, 2007, Plaintiff returned to the NHPC, complaining of increased lower back pain.  (Tr. 505).  She reported that the pain had begun three days earlier, when she bent over to pick up a suitcase and felt a "pop" in her back.  (*Id.*).  She stated that the pain worsened with twisting, extension, and bending, but denied any radicular symptoms.  (*Id.*).  Upon

examination, Dr. Mann observed "distinct point tenderness around the L4-5, L5-S1 face region," and a positive prone straight left leg raise."  (*Id.*).  Plaintiff was said to be suffering from "low back syndrome."  (*Id.*).  She was advised to follow-up with Dr. Wimberley and to start physical therapy.  (*Id.*).

The next week, on November 15, 2007, Fenner was seen by Dr. Wimberley, for radiating leg pain.  (Tr. 480-81).  Fenner reported that the SNRB injections gave her "complete" relief from her pain for a couple of days, but then wore off.  (Tr. 480).  A physical examination showed mild pain with palpation of the lower lumbar spine and the left sciatic notch, but otherwise revealed no abnormalities.  (Tr. 480-81).  An MRI of Plaintiff's lumbar spine confirmed the presence of the following:

> 1. Degenerative spondylosis and desiccation of nucleus pulposis at L5-S1 associated with broad-based right paramedian disc protrusion measuring 2 to 3 mm.  This is smaller in appearance than the prior examination of 02/27/07.
> 2. Minimal annular bulging and facet hypertrophy at L4-5.   No neural compression.
> 3. Small right paramedian 2-mm protrusion at L1-2 unchanged from prior exam.
> 4. Moderate atrophy of posterior lumbar musculature unchanged from prior exam.
> 5. Left convex lumbar scoliosis.

(Tr. 555-56).   Plaintiff was prescribed Neurontin, and instructed to make a follow-up appointment.  (Tr. 481).

On December 6, 2007, Fenner was again seen by Dr. Wimberley.  (Tr. 478-79).  Dr. Wimberley reported that Plaintiff's symptoms were relatively unchanged since her last visit, and that she was having a "predominance of axial spine pain."  (Tr. 478).  He concluded that Fenner suffered from a "multilevel degenerative disease."  (Tr. 479).  Plaintiff was instructed to undergo bilateral L4-5 and L5-S1 facet injections, and to attend physical therapy to strengthen her cervical and lumbar spine.  (*Id.*).

Four days later, on December 10, 2007, Plaintiff received the recommended facet

injections at the NHPC.  (Tr. 333-34).  She reported "complete relief" of her lower back pain. (Tr. 334).

Later than month, on December 27, 2007, Fenner returned to Dr. Wimberley for a follow-up appointment.  (Tr. 476-77).  Plaintiff reported that the facet injections had improved her condition "65-70%," and stated that she was "very happy about her recovery."  (Tr. 476).  Dr. Wimberley recorded his impression that Fenner was "doing much better."  (Tr. 477).  He advised Plaintiff to continue with physical therapy, and told her to follow-up with him only if she remained symptomatic.  (*Id.*).

Fenner had nine appointments with Dr. Berios between January 2008, and July 2009. (Tr. 235-37, 404-09).  Treatment notes from those visits are, for the most part, unremarkable. They reveal no complaints of increased or persistent pain.  On January 8, 2008, and on May 14, 2008, Fenner reported that she was "doing well" on her medications, and stated that she had no complaints.  (Tr. 407, 409).  Plaintiff was noted to have lost weight, and her cholesterol levels had markedly improved.  (Tr. 434-35; *see* Tr. 407, 409).  On August 14, 2008, Fenner reported anxiety, depression, and dizziness.  (Tr. 406).  She was prescribed Lexapro.  (*Id.*).  At an appointment on July 20, 2009, Plaintiff complained of a sinus infection, drainage, and a cough. (Tr. 235).  She also reported that one of her medications caused her to become "nervous" and "nauseous."  (*Id.*).  Her weight on that date was said to be 188 pounds, and her blood pressure was 118/84.  (*Id.*).

On July 23, 2009, Fenner returned to Dr. Wimberley, complaining of a "shooting" pain from her neck to her arms, as well as lower back pain.  (Tr. 474-75).  She reported that she had been "doing well," but that she had "regressed" in December 2008.  (Tr. 474).  Dr. Wimberley examined Plaintiff, and observed "sensory deficits in the hands bilaterally that approximate the

C6 and C7 dermatomes," but otherwise found no abnormalities.  (Tr. 474-75).  Imaging of her cervical spine showed "a solidly healed C3 to C6 ACF."  (Tr. 475).  An electromyogram ["EMG"] and a nerve conduction study ["NCS"] of both upper extremities revealed "no evidence of carpal tunnel syndrome or entrapment neuropathy," and "no evidence of cervical radiculopathy."  (Tr. 456).

On September 3, 2009, Fenner went back to Dr. Wimberley for a follow-up appointment. (Tr. 472-73).  She reported her symptoms had "not changed much" since her last visit.  (Tr. 472). A CT myelogram of Plaintiff's cervical and lumbar spine showed "solid arthrodesis anteriorly from C3-C6," "moderate disk [sic] degeneration at C6-7 with [mild] foraminal stenosis," and "moderate disk [sic] degeneration of L1-2."  (Tr. 473; *see* Tr. 325-27).  Dr. Wimberley concluded that Fenner had "some adjacent segment disease."  (Tr. 473).  Later that month, Plaintiff received bilateral C7 SNRB injections, which decreased her pain levels from "7" to "0." (Tr. 330-32, 335-36).   Fenner was said to be suffering from "post fusion syndrome," "degenerative dis[c] disease," and "cervical radiculopathy."  (Tr. 335).

On September 23, 2009, and September 29, 2009, Fenner returned to Dr. Berios.  (Tr. 233-34).  At the appointment, on September 23, 2009, Fenner complained that the prescribed Levothyroxine was making her "nervous," and causing her heart to "race," and that the Ambien was making her "eat a lot."  (Tr. 234).  She also asked to change anti-depressant medications. (*Id.*).  Her blood pressure was 118/82, and her weight was 194 pounds.  (*Id.*).  Lab work revealed elevated levels of cholesterol, triglycerides, urea nitrogen, and thyroxine.   (Tr. 245-47). Treatment notes from a September 29, 2009 appointment, however, were unremarkable.  (Tr. 233).

Plaintiff saw Dr. Wimberley for a final time on October 15, 2009.  (Tr. 470-71).  Dr.

Wimberley recorded that bilateral C7 SNRB injections had made Plaintiff "25 or 30% better." (Tr. 470).  He wrote that Fenner's "arm symptoms ha[d] responded more so than her posterior neck."  (*Id.*).  A physical examination showed "pain with palpation of [the] cervical paraspinous musculature, primarily on the right near the sub-occipital region;" a "limited range of motion of [the] cervical spine with flexion down to within 2 finger-breadths of [the] chest, extension to about 20 or 25 degrees, lateral flexion of 30 degrees, and rotation of 40 or 45 degrees to the left and right;" "reproduction of some [] cervical pain on the contralateral side when [Fenner] flexes or rotates her neck;" and "sensory deficits in the hands bilaterally that approximate the C6 and C7 dermatomes."  (Tr. 470-71).  Plaintiff's upper extremities exhibited "substantially intact sensation to light touch in the C5 through T1 dermatomes," and "5/5 motor strength at the intrinsics of the hand, long finger flexors, wrist flexors and extensors, elbow flexors and extensors, and shoulder abductors."  (Tr. 471).  Her reflexes were also normal.  (*Id.*).  Dr. Wimberley recorded his impression that Fenner was "clinically better, but not perfect."  (*Id.*).

On October 20, 2009, Fenner received bilateral C7 SNRB injections and bilateral C6-C7 facet injections.  (Tr. 342-43).  After receiving the injections, Plaintiff reported "100% relief of her cervicalgia and cervical neck pain."  (Tr. 343).

On October 29, 2009, Plaintiff went back to Dr. Berios.  (Tr. 232).  She asked to switch anti-depressant medications.  (*Id.*).  Plaintiff weighed 192 pounds on that date, and her blood pressure was 112/70.  (*Id.*).  Her urea nitrogen and thyroxine levels remained elevated, but her cholesterol levels were within normal limits.  (Tr. 243-44).  Plaintiff was said to be suffering from anxiety, depression, hyperlipidemia, and hypothyroidism.  (Tr. 232).

Fenner continued to see Dr. Berios, on a semi-regular basis, for the next two years.  (Tr. 227-31, 389-91).  On May 7, 2010, Plaintiff complained of "aches."  (Tr. 231).  However, a

physical examination was unremarkable, and her lab work revealed no abnormalities. (Tr. 231, 241-42). At an appointment on November 15, 2010, Fenner reported a cough, congestion, hoarseness, and headaches, but made no other complaints. (Tr. 229). Treatment notes from a May 20, 2011 visit show that Fenner was scheduled to have a myelogram "to determine whether she'll have neck surgery." (Tr. 228). The lab work on that date was normal. (Tr. 238). At an appointment on October 10, 2011, Fenner reported increased anxiety. (Tr. 391). She complained of "clinching teeth," "forgetfull[ness]," and "loss of breath." (*Id.*). She stated that her symptoms had begun several years earlier, and that they were "getting worse." (*Id.*). Her weight was 165 pounds, and her blood pressure was 110/70. (*Id.*). Dr. Berios prescribed Fioricet, Estradiol, Ambien, Pravastatin, Maxzide, Paroxetine, and Synthroid. (*Id.*). Fenner saw Dr. Berios for the last time on December 1, 2011. (Tr. 389). Plaintiff requested a refill of her medications, but made no complaints. (*Id.*). She was not given a physical examination. (*Id.*).

In the interim, on October 4, 2011, Fenner was examined by an internist, Dr. Swayam Prakash, on behalf of the Texas Rehabilitation Commission. (Tr. 304-07). Dr. Prakash wrote that Plaintiff had a history of hypertension, hyperlipidemia, hypothyroidism, and joint pain in the neck and lower back. (Tr. 304-05). He reported that her hypertension, hyperlipidemia, and hypothyroidism were all controlled with medication. (Tr. 304). Dr. Prakash described the history of Fenner's neck and lower back pain as follows:

> The patient has a history of osteoarthritis of the neck and three years back had surgery by Dr. Wimberley. She had a plate put in C4-C7 and did well, but she has some numbness and tingling of the hands and carpal tunnel was suspected. She underwent [a] nerve conduction study which did not show evidence of carpal tunnel syndrome. She gets pain in other joints, her back, knees, elbows[,] and shoulders. She is on Fioricet with Codeine as needed which helps her pain. She has not had any investigations in the last two years or follow up [sic] to see if she has any worsening of her condition. She had no recent MRI.

(Tr. 304-05). Upon examination, Dr. Prakash observed "mild restriction of 20 degrees in flexion

18

and extension on the cervical spine," and he noted that Fenner complained of pain "on lateral rotation on both sides," as well as "numbness of the hands and feet at times." (Tr. 306). Dr. Prakash found no evidence of motor weakness, sensory or reflex deficits, neurological changes, or joint swelling. (*Id.*). Plaintiff exhibited a normal range of motion in her shoulders, elbows, wrists, interphalangeal joints, knees, ankles, and hips. (*Id.*). Her grip strength was "5/5." (*Id.*). During the examination, Fenner was able to sit, to stand, to walk on her toes and heels, to squat, to touch her toes, and to pick up an item weighing twenty pounds. (*Id.*). From his review of Plaintiff's x-rays, Dr. Prakash concluded that she did not suffer from any "severe disease." (Tr. 307). Dr. Prakash diagnosed Fenner as suffering from "controlled hypertension," "controlled hypothyroidism," "hyperlipidemia," and "osteoarthritis, status post cervical spine surgery." (Tr. 306).

On October 28, 2011, Dr. Amita Hegde, a non-examining physician acting on behalf of the state, prepared an evaluation of Fenner's physical RFC. (Tr. 308-15). After reviewing the medical evidence, Dr. Hegde made several observations. Dr. Hegde found that Plaintiff could occasionally lift or carry items weighing up to twenty pounds; she could frequently lift or carry items weighing up to ten pounds; she could sit, stand, or walk for at least six hours in an eight-hour workday; and she could perform an unlimited amount of pushing and pulling, within the weight limits previously stated. (Tr. 309). Under the category of "Postural Limitations," she found that Fenner was capable of frequently climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 310). However, Dr. Hegde found that Plaintiff was only occasionally capable of climbing ladders, ropes, or scaffolds. (*Id.*). She further found that Fenner had no manipulative, visual, communicative, or environmental limitations. (Tr. 311-12). Dr. Hegde concluded that the alleged severity and limiting effects of Plaintiff's impairments

were partially supported by the medical evidence.  (Tr. 313).  On January 24, 2012, that physical RFC assessment was affirmed, by Dr. Kelvin Samaratunga, another physician retained by the state.  (Tr. 452).

On February 8, 2012, Fenner sought treatment at the Bacliff Family Healthcare Clinic in Bacliff, Texas.  (Tr. 629).  Fenner requested a cheaper cholesterol medication and inquired about a "sleep aid alternative" to Ambien.  (*Id.*).  During that visit, Fenner complained of neck pain, anxiety, and back pain.  (*Id.*).  An examination of Plaintiff's head, neck, lungs, heart, abdomen, extremities, and nervous system revealed no abnormalities.  (*Id.*).  Her anxiety was noted to be "stable."  (*Id.*).  Plaintiff's blood pressure was 126/82, and she weighed 166 pounds.  (*Id.*).  Fenner was said to be suffering from hypertension, hypothyroidism, hyperlipidemia, and insomnia.  (*Id.*).  Two undated medical records from the Bacliff Family Healthcare Clinic show that Fenner was subsequently found to be suffering from chronic neck and lower back pain, and cervical degenerative joint disease.  (*See* Tr. 630, 633).  She was prescribed Hydrocodone in addition to her other medication.  (*Id.*).

On May 22, 2012, Dr. Phaedra Caruso-Radin, a non-examining psychologist acting on behalf of the state, reviewed Fenner's medical records and completed a "Psychiatric Review Technique" form.  (Tr. 613-23).  Dr. Caruso-Radin concluded that there was "insufficient evidence" to determine whether Fenner, in fact, suffered from a medically determinable mental impairment.  (Tr. 613, 623).

### *Educational Background, Employment History, and Present Age*

At the time of the hearing, Fenner was fifty-four years old, and had completed two years of college.  (Tr. 140, 145).  Her employment history included positions as a realtor, an appointment scheduler, a sales associate, a lab technician, and an office nurse.  (Tr. 154).

### *Subjective Complaints*

In her application for benefits, Plaintiff alleged that she is unable to work, because of "cervical degenerative disc disease," "radiculopathy," "spondylosis," "neuralgia," "stenosis," "myeloradiculopathy," "osteoarthritis," "depression," and "many other conditions."  (Tr. 144). She explained that, as a result of her impairments, she has difficulty sitting, standing, walking, lifting, squatting, bending, reaching, kneeling, talking, hearing, seeing, climbing stairs, using her hands, completing tasks, following instructions, concentrating, remembering, understanding, and getting along with others.  (Tr. 167).  She stated that, because of her impairments, she has pain "laying in any position," and that, as a result, she is unable to sleep through the night.  (Tr. 163). She also said that she is unable to prepare complex meals, to do yardwork, to vacuum, to button shirts, or to fix her hair.  She stated that, on a typical day, she is usually sitting or lying down on the couch watching television.  (Tr. 163).  She noted, however, that she regularly does "light" housework, goes grocery shopping, prepares simple meals for her family, and bathes and dresses herself.  (*Id.*).  Fenner reported that she is unable to go out by herself, because she is "afraid to drive."  (Tr. 165).  She stated that, due to her fears of the progression of her pain, she is "very nervous [and] anxious most of the time," and her concentration "has gotten bad."  (Tr. 167-68).

At the hearing, Fenner testified to the severity and debilitating effects of the impairments from which she suffers.  She testified that she has progressively worsening pain in her lower back, neck, and hips, stemming from a 2007 cervical fusion procedure.  (Tr. 48-49, 53-54; *see* Tr. 34-35).  Fenner told the ALJ that steroid injections and selective nerve root block injections had helped to alleviate her pain, but stated that those treatments were only effective "for a short time."  (Tr. 46).  She stated that she had stopped receiving medical care for her condition in 2009, because she "no longer had medical benefits."  (Tr. 45).  Plaintiff told the ALJ, that due to

the pain in her joints, she has difficulty sitting, standing, lying down, walking, lifting objects, and gripping with her hands.  (Tr. 46-49, 55-56).  Plaintiff testified that she can sit or stand in one place for only fifteen minutes at a time, that she can lie down for only one hour at a time, and that she can only walk for "a few minutes" before she must sit down.  (Tr. 46-49).  She further testified that she has difficulty lifting or carrying items of any weight, and that she frequently drops things.  (Tr. 55-56).  Fenner also reported that she experiences "tingling and numbness" in both of her legs.  (Tr. 48-49).  She further reported that she is unable to drive, because "it's too hard for [her] to look around to see if [] a vehicle [is] behind [] or on the side of [her]."  (*Id.*).

Fenner told the ALJ that she currently lives in a house with her husband, but that her adult daughter lives close by.  (Tr. 50-52).  She testified that, on a typical day, she spends more than half of her time "laying down on a heating pad."  (Tr. 47).  Fenner stated that her daughter comes over several times each week to help her with housework.  (Tr. 54-55).  She stated that she is unable to "do anything or go anywhere," because she is "afraid' that she will have "difficulties."  (Tr. 49).  Plaintiff admitted, however, that she is able to prepare simple meals, to bathe and groom herself, to do light housework, and to go with her daughter to the grocery store.  (Tr. 49-50, 52-55).

### Expert Testimony

At the hearing, the ALJ also heard testimony from a board certified physical medicine and rehabilitation physician, Dr. John C. Anigbogu.  (Tr. 37-45, 113).  From his review of the available medical records, Dr. Anigbogu testified that Fenner suffered from cervical spine stenosis, arthropathy, lower back pain, hyperthyroidism, and hypertension.  (Tr. 39-40).  Dr. Anigbogu concluded, however, that none of those conditions, individually or in combination, met or equaled in severity any of the listed impairments.  (Tr. 40-41).  He noted, in particular,

that Fenner had not had any "significant treatment" in the past few years.  (Tr. 41).  Dr. Anigbogu concluded that Fenner retained the RFC to perform sedentary work without limitation. (Tr. 41-43).

The ALJ also heard testimony from Byron Pettingill, a vocational expert.  (Tr. 58-66, 112).  Mr. Pettingill characterized Fenner's prior work experience, as an appointment clerk, as "sedentary," in exertional level, and "semiskilled."  (Tr. 59).  He characterized Fenner's positions as a real estate agent, a lab technician, and an office nurse as "light" and "skilled."  (Tr. 59-60).  The ALJ then posed the following questions to Mr. Pettingill:

Q  [A]ssume that the individual is the same age, education, and vocational history as the claimant[,] . . .this is a person who can lift and/or carry 10 [pounds] occasionally and less than 10 pounds frequently.  This hypothetical person can stand and/or walk with normal breaks for a total of at least [] two hours in an eight hour work day.  This person can sit with normal breaks for a total of about six hours in an eight hour work day[,] [a]nd can push and pull within those stated exertional limitations.  There are no established postural, manipulative, visual, communicat[ive], or environmental limitations and there are no established severe mental medically determinable impairments.  Now with these limitations, could the person perform any of the past relevant work that the claimant perform[ed] either as she actually performed it or as it is customarily performed in the national economy?

(Tr. 60-61).  The witness then replied that such a person could perform Plaintiff's past relevant work as an appointment clerk.  (Tr. 61).

Fenner's attorney then posed a series of hypothetical questions to the vocational expert, as follows:

Q  [I]f our hypothetical person were required to be able to get up and stand up every 10 minutes or less and remain standing from three to five minutes, would that impact their ability to keep and maintain any of these [positions]?

A  Yes, sir, it would.

Q  In what way?

***

A [T]hey just [wouldn't] have the emotional where with all to maintain employment. [Such a person would] just generally give up if they're constantly up and down, up and down, all day long.

Q Okay, and if our hypothetical person were required to lay down for at least half of a normal work day, would that impact their ability to keep and maintain employment?

A Yes, sir.

Q In what way?

A I don't think they could maintain employment with that limitation, no.

(Tr. 64-65).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence. (Tr. 18-24). From her review of the record, she determined that Fenner suffered from "discogenic and degenerative disorders of the cervical and lumbar spine with residual effects of cervical spine surgery," as well as "hypertension," and that those conditions were "severe." (Tr. 20). She determined, however, that Plaintiff's alleged mental impairment of depression was not "medically determinable." (Tr. 21). The ALJ further concluded that Fenner did not have an impairment, or any combination of impairments, which met, or equaled in severity, the requirements of any applicable SSA Listing. (*Id.*). Next, the ALJ assessed Fenner's RFC, and found that she can "perform the full range of sedentary work as defined in 20 CFR 404.1567(a)." (*Id.*). The ALJ concluded that, while Fenner's impairments could reasonably be expected to cause the alleged symptoms, her testimony regarding the intensity, persistence, and limiting effects of her conditions was "not entirely credible," as it was inconsistent with the RFC assessment. (Tr. 22-23). The ALJ also concluded that Fenner's testimony was inconsistent with the medical evidence of record. (*Id.*). Based on the vocational expert's testimony, the ALJ

24

determined that Fenner was capable of performing her past relevant work as an appointment clerk.  (Tr. 23-24).  Ultimately, she concluded that Fenner was not under a "disability," as defined by the Act, and she denied her application for benefit.  (Tr. 24).  That denial prompted Hoyle's request for judicial review.  (*See* Complaint).

In this action, Plaintiff claims that the ALJ's determination, that she is not under a "disability," is not supported by substantial evidence.  (Pl.'s Mot. 5-12).  Specifically, she argues that the ALJ erred at step two of the sequential evaluation process, because she failed to classify her mental impairments as "severe."  (*Id.* at 4).  In her second argument, Plaintiff contends that the ALJ's assessment of her RFC is not supported by substantial evidence, because she "fail[ed] to properly consider and evaluate" the effect of her anxiety and depression symptoms on her ability to work, and because did not "discuss[] and evaluate[]" her "need for additional neck surgery."  (*Id.* at 4-5).

It is well-settled that judicial review of the Commissioner's decision is limited to the determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *see generally* 42 U.S.C. § 405(g). Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *Copeland*, 771 F.3d at 923.  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

### *Severity Finding*

Fenner argues that the ALJ erred at step two of her analysis by failing to classify her anxiety and depression as "severe."  (Pl.'s Mot. 4, 8-12).  Plaintiff contends that "[t]he

evidentiary file is replete with diagnoses" of those conditions.  (*Id.* at 9).  In making that argument, Fenner stresses that she has had difficulty obtaining mental health treatment for the past few years, because she "live[s] in a rural setting," and because she "ha[s] no finances or [medical] insurance."  (*Id.* at 11).

At step two, the ALJ must consider whether the claimant has a medically determinable impairment or combination of impairments that are severe.  20 C.F.R. § 404.1520(c).  A "severe" impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521.  An impairment is "medically determinable" if it "result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 416.908.  An impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic findings."  42 U.S.C. § 423(d)(3), (d)(5); *Randall v. Astrue*, 570 F.3d 651, 657 (5th Cir. 2009).

In her written decision, the ALJ concluded that Plaintiff suffered from two "severe" conditions: (1) dicogenic and degenerative disorders of the cervical and lumbar spine with residual effects of cervical spine surgery; and (2) hypertension.  (Tr. 20).  The ALJ found, however, that Plaintiff's depression was "not medically determinable."  (Tr. 21).  In making that determination, the ALJ relied on the Psychiatric Review Technique evaluation, completed by Dr. Caruso-Radin in May 2012, which stated that Fenner did not have any medically determinable mental impairments.  (*Id.*; *see* Tr. 621-23).  In addition, the ALJ underscored that the medical evidence did not include any mental health assessments, diagnoses, or treatment records from mental health professionals.  (Tr. 21).  She also pointed to evidence that Plaintiff was prescribed anti-depressants purely in response to her subjective complaints of depression.  (*Id.*; *see* Tr. 398, 400, 402, 406).

Here, the ALJ's step two findings are supported by substantial evidence.  Importantly, as Defendant correctly points out, Fenner did not allege, either in her DIB application, or at the hearing, that she suffers any specific functional limitations due to either anxiety or depression. *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (holding that an ALJ did not err in finding no severe mental impairments, because the plaintiff did not allege mental impairments in her DIB application).  Indeed, Plaintiff has never alleged a disability from anxiety, at all.  (*See* Tr. 45-58, 144).

Further, there is nothing in the record to suggest that Fenner is unable to work due to a mental impairment.  Treatment notes from 2011 and 2012 reveal no objective findings of psychiatric abnormalities.  (*See* Tr. 228, 304-07, 391, 629-30, 633).  On October 4, 2011, Fenner reported a history of depression, but did not complain of any active symptoms.  (Tr. 304).  At an October 10, 2011 appointment, Fenner did complain of "anxiety," "clinching teeth," "forgetfull[ness]," and "loss of breath."  (Tr. 391).  However, Dr. Berios found her psychiatric and neurological facilities to be within normal limits.  (*Id.*).  At a February 8, 2012 appointment, her anxiety was noted to be "stable."  (Tr. 629).

It is also important that Fenner did not seek out professional mental health treatment for her alleged conditions.  Plaintiff claims that she has been unable to obtain mental health treatment due to financial hardship, as well as geographic isolation.  (Pl.'s Mot. 11).  However, Plaintiff neither argues, nor submits evidence to show that she attempted to avail herself of free or reduced costs mental health services. *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Hicks v. Astrue*, No. 11-3090, 2012 WL 5383190, at *8 (W.D. Ark. Oct. 2, 2012).

On this record then, the ALJ's severity findings at step two of the five-step analysis are supported by substantial evidence.

***RFC Assessment***

Next, Fenner contends that the ALJ's RFC determination was not supported by substantial evidence, because she did not take into account her mental impairments, or her need for "additional neck surgery." (Pl.'s Mot. 5-8).

Here, the ALJ's RFC finding is supported by substantial evidence. In her written decision, the ALJ concluded that Plaintiff is able to "perform a full range of sedentary work." (Tr. 21). She based her conclusion on: (1) Dr. Prakash's consultative examination report, which showed, among other things, that Plaintiff could sit, stand, walk on her toes and heels, squat, and touch her toes, and that she had a normal range of motion in her ankles, knees, hips, shoulders, elbows, wrists, and hands; (2) the absence of any significant medical records since 2009; (3) treatment notes that show unremarkable examinations; and (4) Fenner's own reported activities of daily living. (Tr. 22-23). In evaluating Fenner's RFC, the ALJ gave "significant weight" to Dr. Anigbogu's expert testimony. (Tr. 23). She referenced his findings that Fenner has no postural limitations, and remarked that his opinion was consistent with Dr. Prakash's findings. (*Id.*).

At step four of her analysis, the ALJ specifically referenced Plaintiff's subjective complaint that her limitations have "worsened considerably over the past year." (Tr. 22). However, the ALJ concluded that Fenner's statements were not supported by the medical record. (*Id.*). In particular, she emphasized that treatment notes from 2009, 2010, and 2011 "show only that her medication regimen remained constant over the period in question and did not change." (*Id.*). The ALJ also referenced Fenner's claimed mental impairment of depression, but found that it was not "medically determinable." (Tr. 21). She therefore did not include that limitation in her RFC assessment. *See* 20 C.F.R. §§ 404.1508, 404.1513, 404.1523, 416.908, 416.923; *see*

*also Gibbons v. Barnhart*, 85 F. App'x 88, 91 (10th Cir. 2003) ("the ALJ must consider only limitations and restrictions attributable to medically determinable impairments").

On this record, the ALJ properly exercised her responsibility as fact finder in weighing the evidence, and in choosing to incorporate limitations into the RFC assessment that were supported by the record. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For that reason, the ALJ's RFC assessment was supported by substantial evidence.

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall send copies of the memorandum and order to all counsel of record.

**SIGNED** at Houston, Texas, this 31st day of March, 2016.

**MARY MILLOY
UNITED STATES MAGISTRATE JUDGE**